IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| BLACK WARRIOR RIVER-KEEPER, INC., et al., | CASE NO. 2:23-cv-1211-RDP |
| Plaintiffs, | |
| v. | |
| BLUESTONE COKE, LLC, et al., | |
| Defendants. | |

* * * * * * * * *

**TRANSCRIPT OF MOTION HEARING**

* * * * * * * * *

BEFORE THE HONORABLE R. DAVID PROCTOR, UNITED STATES DISTRICT JUDGE, at Birmingham, Alabama, on Wednesday, August 21, 2024, commencing at 1:06 p.m.

Proceedings reported by stenographic court reporter, transcript produced using computer-aided transcription.

**Transcript prepared by:**
Pamela G. Weyant, RDR, CRR, CCR
Official Court Reporter

APPEARANCES:

FOR THE PLAINTIFFS:          Eva L. Dillard
                             BLACK WARRIOR RIVERKEEPER, INC.
                             712 37th Street South
                             Birmingham, Alabama   35222-3206

                             Ryan S. Anderson
                             Sarah Stokes
                             SOUTHERN ENVIRONMENTAL LAW CENTER
                             2829 2nd Avenue South
                             Suite 282
                             Birmingham, Alabama   35233

FOR THE DEFENDANTS:          James V. Seal
                             Law Office of James V. Seal, LLC
                             2528 Woodmere Drive
                             Vestavia Hills, Alabama   35226

(Proceedings commenced at 1:06 p.m. in open court.)

THE COURT: All right. Let's talk about how to run a railroad, shall we? Because this is no way to run a railroad. This is bordering on ridiculous, isn't it, Mr. Seal?

MR. SEAL: I agree, Judge.

THE COURT: So where -- you agree, but yet here we are.

MR. SEAL: Judge, I think we've reached --

THE COURT: Well, that's good, because I was going to step out for about five minutes and let you-all reach something.

MR. SEAL: Well, I think we've already done that. We'd like to approach or do this with you in some way --

THE COURT: How about we just go in chambers? Is that what you-all would like to do?

MR. SEAL: I think --

THE COURT: Is this off the record or on the record?

MR. SEAL: Well, I think we need to have the discussion off the record. Then I believe it's --

THE COURT: Then we put whatever we want on the record? I'm fine with that.

MS. STOKES: We really would like the final discussion on the record.

THE COURT: It will be.

MS. STOKES: Thank you, Your Honor.

THE COURT: But how we -- I mean, it seems to me like Mr. Seal would like to have some discussions about some things off the record and then put whatever agreement you-all reach on the record. And I think I just heard your colleague whisper it's okay to have a discussion off the record as long as we have the final resolution on the record.

Is that a fair translation of the whisper I heard?

MS. DILLARD: Yes, Your Honor.

THE COURT: Okay.

MR. SEAL: Judge's statement is exactly what I would say from my side.

THE COURT: Okay. So you-all walk around through those doors to chambers and they'll let you in. Pam, if you'll join us and -- I'm sorry. We won't -- Pam will not join us in chambers, but we'll let Pam record whatever we have here whenever we get back out.

But let me just be clear: I want an explanation about whether we've got somebody who's just -- can't do or won't do or a combination of both, all right? I am not going to tolerate this in any way, shape, or form, okay?

MR. SEAL: Understood.

THE COURT: So whatever discussion we have in chambers that gets in the record, we need to understand that this is not how we're going to proceed in this case going forward. If it is, then people are going to be getting checkbooks out.

MR. SEAL: Understood.

THE COURT: All right. I'll meet with you-all in chambers in a moment.

(Recess taken at 1:09 p.m. to 1:46 p.m.)

THE COURT: Okay. We had a not very lengthy discussion in chambers, and I think what we gathered from that is there is not a clear path to resolving this.

Here's what I'm thinking. I think at this point the defendants are in contempt. I've ordered them to do certain things and they haven't done it. My -- here's what I propose, and I want to hear -- before I do it, I want to hear from the parties about whether this makes sense.

I'm going to propose that we pick a date -- we -- I'm going to enter an order saying they're in contempt. I've ordered them to produce documents. They've not produced the documents. Plaintiffs have moved to enforce. They're in contempt.

They can purge the contempt by producing the documents and paying some reasonable fees and costs, and we'll pick a date at which they can purge themselves of the contempt. If they don't do that, then the Court's going to find them in contempt and invite -- and order them to come to Birmingham, the LLC and the two individual defendants, to appear and show cause why they should not be held in contempt, including the following sanctions: Default judgment in this case and other

remedies that would be appropriate for contemptuous conduct -- contumacious conduct, okay? That gives them an off-ramp if they want to avoid this.

And what I would say, Mr. Seal, is they may not listen to you, can't make them listen to you, but I can order you to say it to them. I'm not fooling around anymore. This has gotten past the point of any good faith in this case.

Now, anybody have any input about the Court's proposed resolution of the current dispute?

MS. STOKES: Your Honor, this is Sarah Stokes. I would just like to make sure that that time frame is a short time frame, within two to three weeks.

THE COURT: An appropriate time frame, but yeah. I'm not going to call it short or long. I'm going to call it appropriate. We've got to give them time to get the order and decide if they're going to get the documents to you and talk to you about what fees and costs should be. But I think two or three weeks makes sense for that time frame, if that's what you're asking.

MS. STOKES: Yes, sir.

THE COURT: I would say three weeks.

MS. STOKES: Okay.

THE COURT: So three weeks from today would be September 11th.

MS. STOKES: Your Honor, you also have the power to

strike their affirmative defenses as --

THE COURT: Well, that's -- I said other appropriate sanctions. So, I mean, put it this way: At this point the best solution to all this would be that they get you the documents you're owed, reimburse you for the cost of having to claw them out of their hands, and then we get on with the dern litigation; right? That's the best scenario.

So if that's the case, then they'd purge themselves of the contempt and they would be on, I don't know if you want to call, it thin ice or a short leash after that. If there's any other hiccups, then the Court's not going to be as patient with those, okay?

If they do show up and start behaving the way they should and functioning the way they should as defendants in this case, then I'd probably order the parties to actually mediate the case, because what I recall from when we referred it to Judge Ott -- and by the way, Judge Ott did me a huge favor by agreeing to take this on, and then they wouldn't even submit a mediation statement to him or agree to the dates that he was looking to mediate the case. So, I mean, what we have here is we don't have a pattern. What's even more significant than a pattern?

MS. STOKES: A character trait?

THE COURT: Or something. The point is, is this has permeated every aspect of this case from the defense

standpoint. I'm going to give them a chance. There's an off-ramp here. If you want to stay on the superhighway toward contempt and sanctions, default judgment, and anything else that would be appropriate for the Court to consider, then you should just stay on the road you're on, right, Mr. Seal? But if you -- the Court's going to give you a chance to have an off-ramp, okay?

I don't think I'm entitled -- I don't think they're entitled to that. I don't think I'm required to give it to them, but look, we'd always rather get the cases decided on the merits, not based upon procedural matters. So that's why I'm giving the off-ramp.

MR. SEAL: Thank you, Judge.

THE COURT: They're in contempt. I'll enter an order saying they're in contempt. The Court's withholding any contempt sanctions, though, to give them an opportunity to purge themselves of the contempt. If they'll do that by -- and what I want is certification from the plaintiffs by -- on September 11th either they have -- we have a working agreement with them about we either have the documents or we're assured we're going to get the documents and we've negotiated cost and fees, or that hasn't occurred, the defendants have not produced the documents and there's no indication they're going to produce the documents.

Then I will then take it to the next step with

requiring them to come in and show cause in person why they should not be held in default and for the Court to consider other sanctions that would be appropriate in such a contempt situation.

MS. STOKES: Thank you, Your Honor. They were supposed to show up today, as you pointed out, and they didn't. So are they, you know, in double contempt because they didn't produce the discovery --

THE COURT: Double secret probation.

MS. STOKES: Okay. And so you will put out the fact -- you will say that they -- that you will be considering default judgment like you did in Drummond v. Collingsworth? In that case you said, I am going to be considering default judgment and that led you to --

THE COURT: And I'm still doing it in that case, by the way. But all that to say, again, they may very well say, Well, he's not serious. I mean, we were -- he ordered us to come in and appear -- and I'm -- this is going to be much more clear in a paper order rather than a text or communication that they're going to have to do this, okay?

So, you know, I'll be honest with you, next month it's going to be 21 years. I've never had this type of conduct, that I can recall. I just asked my clerk if she could recall anything like this. Not off the top of her head anyway. I've just not had this thumb of the nose. So I promise you, I'll

deal with it if it continues, but --

MS. STOKES: Thank you, Your Honor.

MR. SEAL: Understood. Counsel understands that, Your Honor, and will relay that to his client.

THE COURT: Well, good luck with that, as they say. But look, the proof will be in the pudding, right?

MR. SEAL: That's correct.

THE COURT: I just -- what I'd like to do, if we get to the point where -- and I hope the plaintiffs understand this -- if we get to the point where we have to bring down the hammer, I just want to be able to say to myself and to anyone else who might ask, I gave them every opportunity, had no choice. Okay?

I used to be an old labor and employment attorney. My advice to my clients was you never fire an employee. The employee fires themself. You give them every opportunity to succeed or to change things around, and if they don't, then you let them go.

Well, we're going to give them every opportunity to avoid this, but if it's not avoided, it's not because of the plaintiffs, it's not because of the Court, it's not because of defense counsel. It's because the corporate and individual defendants simply decided that they didn't care enough to take care of the business. And if they do that, they're going to wish they had.

MR. SEAL: Understood, Judge.

THE COURT: Simple as that. Again I'm not making threats. I'm not making promises. I'm just stating realities here that this is where we are. And I've got better things to do. You-all have better things to do than be chasing tails in this case.

MS. STOKES: Your Honor, can we also get an extension on all of the dates that are in the scheduling order on Doc. No. 40 out -- can we get extension for 90 days?

THE COURT: They're going to be continued generally until we find out where we are.

MS. STOKES: Thank you, Your Honor.

THE COURT: We'll put that in the order that any current deadlines are continued generally because of the defendants' noncompliance and need to see if they're willing to take an exit ramp. Okay?

Probably be tomorrow or Friday before we get the order out. I want to think about it a little bit more about exactly how the order gets worded, but it's going to be consistent with what I just laid out here.

What else?

MS. STOKES: I don't have anything else, Your Honor.

THE COURT: Mr. --

MR. SEAL: Nothing further, Your Honor.

THE COURT: So, Mr. Seal, let me -- I've used this

analogy before in a discovery dispute among lawyers and I'm going to give you this analogy that maybe your clients can understand.

There was a great movie in the '60s where Paul Newman played the part of Luther Jackson.  Do you know the movie I'm talking about?  I heard somebody whisper it.

MR. SEAL:  Any thoughts?

THE COURT:  I'm sorry?

UNIDENTIFIED SPEAKER:  I said "Cool Hand Luke."

THE COURT:  "Cool Hand Luke."  That's the movie.

So Luther Jackson plays -- I'm sorry -- Paul Newman place Luther Jackson, a decorated war hero who has a particularly rough night drinking and destroying a bunch of parking meters in Florida.  He is arrested and convicted, and he ends up on a Florida chain gang.  The warden is Cap'n, C-A-P apostrophe N, played by Strother Martin.  And the movie deals with the strained relationship that Luke has with authority.  And he makes an escape attempt and he gets caught, brought back in.

And maybe one of the key scenes in the movie is he is now handcuffed and standing before the entire prison population of that chain gang, and Cap'n is addressing not him as much as the rest of the prisoners who would think about plotting the authority -- plotting an escape.  And he has a famous line.  Anybody know what this is?

UNIDENTIFIED SPEAKER:  What we have here is a failure to communicate.

THE COURT:  That's exactly right.  What we have here is a failure to communicate.

So I'm trying to communicate well.  Your clients need to be reminded of this.  Paul Newman, after Cool Hand Luke was played in the theaters, went on to fame and fortune as a movie star but his character, Luther Jackson, was gunned down at the end of the movie.  That's what I want them to understand is we're dealing with a failure to communicate but it's going to get worse if we don't start communicating.  All right?

MR. SEAL:  Understood, Judge.

THE COURT:  All right.  Make sure you -- even if you have to order a transcript, you make sure you have that message to them.

MR. SEAL:  It will be preordered.

THE COURT:  All right.  We'll be in adjournment.  I will put an order out on this.

MR. SEAL:  Thank you, Judge.

(Adjourned accordingly at 2:00 p.m.)

C E R T I F I C A T E

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Dated:  December 5, 2024

*Pamela G. Weyant*
Pamela G. Weyant, RDR, CRR, CCR
Official Court Reporter